No. 31,989

ROBERT MOFFETT, *Appellee*, v. EVELYN MOFFETT, *Appellant*.

(45 P. 2d 579)

Opinion filed June 8, 1935.

*J. H. Brady* and *N. E. Snyder,* both of Kansas City, for the appellant.
*David F. Carson,* of Kansas City, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was a divorce action brought by Robert Moffett against Evelyn Moffett, in which he alleged as grounds extreme cruelty and gross neglect of duty.

The case was initiated before Judge William H. McCamish, judge of division number three of the district court of Wyandotte county. After it had proceeded for a time the court postponed it in order that appellee might get additional evidence. When it came up for trial again it was in division number two, presided over by Judge Clyde C. Glandon, who tried the case to the end and rendered final judgment.

The parties were married in Pueblo, Colo., in the month of December, 1919, and have been husband and wife since that time. Each party had been married before. She had been living in Newton, but shortly after their marriage they made their home in Kansas City. They appeared to live in harmony for a short time. He was employed as a porter for the Atchison, Topeka and Santa Fe Railway Company, and had a run from Kansas City to Wellington and Newton.

In support of his charge of extreme cruelty he testified that in 1929 they drove to St. Joseph, Mo., with two friends. On the way there she drove the car and seemed to be trying to pass everyone on the road. He told her not to drive so fast and she called him

"ignorant and crazy," and said he could not tell her how to drive. Out in the country she drove fast and turned the car over in the ditch. She cursed him at that time and used vile language in the presence of their friends. It hurt plaintiff's feelings and brought distress. He was not used to such language. He testified of an occasion the following year, in June, 1930. She acted as though she was sick, and when he asked her if she was sick she began cursing and hitting him, and tried to get a gun. He had a little police dog and during the encounter warned her to watch the dog. She then cursed the dog; grabbed a waste basket full of paper and struck him on the head. This experience had the effect of making plaintiff sick and he had to lay off his job for some time.

Plaintiff further testified that she received calls from strange men, complaining about their not having met her; they squabbled over the telephone in his presence and in his home. She refused to cook his meals; refused to allow him to get into his own icebox. He went to get a drink and she shoved him away from the cabinet. He started to cook his own meals and she said she would get a gun and "blow his damn brains out." She started going out nights in 1930. When plaintiff asked her where she had been she would say she had been over to town; or that she was grown and did not have to tell him. That occurred frequently. Plaintiff was away three nights a week and every time he came home after that she would stay out all night.

Plaintiff had a niece living in the house, Marie Moffett. They had a beauty parlor in the house, and had a couple of boarders for one season. Defendant got the money. She used it for her own benefit, not for the benefit of the house. Plaintiff did not know what she did with the money. She went to Chicago once or twice. She went to Los Angeles, and wherever she wanted to go. She went to Los Angeles in 1928 and stayed there two months. Plaintiff asked her to come back. Plaintiff paid her expenses for two months in Chicago and for a couple of months in Brooklyn, N. Y.

There was a change of judges in the trial, from Judge McCamish to Judge Glandon, and this gives rise to a claim that the subsequent judge was not informed as to what had been given when his predecessor had it before him. It is well settled that in the administration of justice the subject is not affected by a change of judges. In *Kansas City P. & L. Co. v. City of Elkhart,* 139 Kan. 374, 31 P. 2d 62, it was said:

"Court officials come and go, but the institution remains. Rights of litigants in court are neither enhanced nor curtailed by a change of judges. When one judge vacates the bench, whether he is the regular judge, or *pro tempore,* or *pro hac vice,* his successor takes up and dispatches all pending judicial business, except where he may be disqualified because of interest in the litigation." (p. 376.) See, also, *Madden v. Glathart,* 115 Kan. 796, 224 Pac. 910.

In *In re Day,* 129 Kan. 14, 18, 281 Pac. 865, it was said:

"The continued existence and identity of the court was not affected by a change of judges. The court does not resign or die and does not become defunct by the absence or change of its functionaries. The incoming judge had power to take up and dispose of unfinished business as fully as his predecessor could have done if there had been no change of judges."

Most of the testimony was heard by the judge who subsequently tried the case, and it appears from the record that it was tried out by the subsequent judge quite fully and was heard by him as fully as if no change had been made. Some of the testimony was repeated several times and was heard as completely as if no change had been made in judges. It may be assumed that the judge was fully informed as to what had transpired before the first judge who acted in the case, and having been informed as to that matter he decided the case and entered judgment granting the divorce to the husband. The judgment is warranted by the evidence.

In an answer which she had filed defendant finally asked a divorce from her husband on account of his cruelty and gross neglect of duty, but the court concluded that she was most at fault and granted plaintiff a divorce from her. There were some questions as to whether he had corroborating evidence of her faults. There was some corroborating evidence of the charges made in the husband's testimony, and the court considered the storms of cursing and swearing and calling of names by defendant, but said in deciding the case:

"I don't care to comment particularly upon the testimony by which I arrive at the conclusion I have arrived at; and I don't think it is necessary for me to give the various reasons I have for my decision in the matter; but I think in this case the divorce should be granted to Mr. Moffett. That disposes of the divorce matter."

The court remarked that it was impossible for the people to live together as husband and wife, and therefore the divorce was granted.

Then there is another thing that will be mentioned later—that she is not entitled to question the order granting a divorce. She is appealing on the allowance of alimony that was granted to her,

and is not particularly questioning the divorce on the ground on which it was granted. She was allowed the furniture in the nine-room house and then the court gave her the certificate of the United Securities Company, on which $305 had been paid, free and clear of the lien and claim of the plaintiff. The nine-room house had considerable furniture; all the rooms were adequately furnished. It is remarked that she said it would not bring more than $100, but it was worth much more than that, and it was estimated to be worth about $1,000. The court appeared to think that he was dividing the property equitably between them. The house was worth about $2,000 and the automobile, which was bought in 1928, about $150.

A small difference in the amounts awarded to each of the parties would bring the amounts about equal. There is testimony that the certificate on which $305 had been paid was in her possession or that of her attorney, but has not been assigned to her by the plaintiff. The court determined that plaintiff should pay the costs of the action, and when these are considered there is little chance for claiming that there is much difference in the amounts awarded. The divorce having been granted to him, the costs might have been assessed to her. There was the house given to him that was estimated at $2,000, then the old automobile which is estimated at $150, altogether $2,150. If she got the furniture, estimated at $1,000, and the certificate, and if we consider the costs of the case, which were not estimated, as having been assessed to her, this would cover a good deal of the difference in the amounts awarded to each of them.

However, she is appealing and has acquiesced in the judgment. She is asking for an appeal and has received the property awarded to her. She has gone to the house where it was kept and taken possession of it. She admits that she took possession of the property awarded to her, and has it in her exclusive control now. It is no longer in the control of the court, and she has possession of it as fully as if she did not intend to appeal. If she intended to appeal she could have so announced and left the property where it had been, but when-she took possession of it she acquiesced in the judgment, and within the authorities, only some of which are cited, she lost her right of appeal. (*Wolf v. McMahon,* 26 Kan. 141; *Fenlon v. Goodwin,* 35 Kan. 123, 10 Pac. 553; *Pazer v. Davis,* 104 Kan. 403, 179 Pac. 309; *Bank v. Bracey,* 112 Kan. 677, 212 Pac. 675; *Fadely v. Fadely,* 128 Kan. 287, 276 Pac. 826; *Simon v. Crow,* 131 Kan. 638, 293 Pac. 400; *Paulsen v. McCormack,* 133 Kan. 523, 1 P. 2d 159;

*Wilhite v. Judy,* 137 Kan. 589, 21 P. 2d 317; *Mann v. Mann,* 140 Kan. 538, 38 P. 2d 147; 3 C. J. 665.)

It follows that the action of the defendant operates to cure any errors, if any there were in the judgment, and that the appeal is therefore dismissed.